**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

JOINT STOCK COMPANY )
COMMERCIAL BANK PRIVATBANK, )
                                         )
             Plaintiff, )
                                           )
          v. )      **C.A. No. 2019-0377-JRS**
                                           )
IGOR VALERYEVICH KOLOMOISKY; )
GENNADIY  BORISOVICH )
BOGOLYUBOV; MORDECHAI KORF; )
CHAIM SCHOCHET; URIEL TZVI )
LABER; CHEMSTAR PRODUCTS LLC; )
GEORGIAN AMERICAN ALLOYS, )
INC.; OPTIMA ACQUISITIONS, LLC; )
STEEL ROLLING HOLDINGS, INC.; )
OPTIMA GROUP LLC; OPTIMA )
VENTURES LLC; OPTIMA 55 PUBLIC )
SQUARE, LLC; OPTIMA ONE )
CLEVELAND CENTER, LLC; OPTIMA )
1375, LLC; OPTIMA 1375 II, LLC; )
OPTIMA 1300, LLC; OPTIMA 777, LLC; )
OPTIMA STEMMONS, LLC; OPTIMA )
7171, LLC; OPTIMA 500, LLC; OPTIMA )
925, LLC; WARREN STEEL )
HOLDINGS, LLC; OPTIMA )
INTERNATIONAL OF MIAMI, INC.; )
FELMAN TRADING, INC.; VERONI )
ALLOYS, LLC; DEMETER )
DIVERSIFIED LLC; EMPIRE )
CHEMICAL, LLC; TALBON )
ALLIANCE, LLC, )
                                           )
             Defendants. )

# MEMORANDUM OPINION

Date Submitted: July 21, 2021
Date Decided: August 23, 2021

Michael A. Barlow, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware; William A. Burck, Esquire and Alexander J. Merton, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC; and Rollo C. Baker, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP. New York, New York, Attorneys for Plaintiff Joint Stock Company Commercial Bank PrivatBank.

David J. Margules, Esquire and Elizabeth A. Sloan, Esquire of Ballard Spahr LLP, Wilmington, Delaware; Jason Cyrulnik, Esquire and Paul Fattaruso, Esquire of Roche Cyrulnik Freedman LLP, Brooklyn, New York; and Devin Freedman, Esquire of Roche Cyrulnik Freedman LLP, Miami, Florida, Attorneys for Defendants Georgian American Alloys, Inc., Optima Acquisitions, LLC, Steel Rolling Holdings Inc., Optima Group LLC, Optima Ventures LLC, Optima 55 Public Square, LLC, Optima One Cleveland Center, LLC, Optima 1375, LLC, Optima 1300, LLC, Optima 777 LLC, Optima Stemmons, LLC, Optima 7171, LLC, Optima 500, LLC, Optima 925, LLC, Warren Steel Holdings, LLC and Felman Trading, Inc. (the "Optima Defendants").

Raymond J. DiCamillo, Esquire, Daniel E. Kaprow, Esquire and Megan E. O'Connor, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Marc E. Kasowitz, Esquire, Daniel R. Benson, Esquire, Mark P. Ressler, Esquire, Sarmad M. Khojasteh, Esquire and Joshua N. Paul, Esquire of Kasowitz Benson Torres LLP, New York, New York, Attorneys for Defendants Mordechai Korf, Chaim Schochet, Uriel Tzvi Laber, Optima 1375 II, LLC and Optima International of Miami, Inc.

Albert H. Manwaring, IV, Esquire and Albert J. Carroll, Esquire of Morris James LLP, Wilmington, Delaware and Dane H. Butswinkas, Esquire, David S. Blatt, Esquire, Matthew B. Nicholson, Esquire and Tanya M. Abrams, Esquire of Williams & Connolly LLP, Washington, DC, Attorneys for Defendant Gennadiy Borisovich Bogolyubov.

**SLIGHTS, Vice Chancellor**

Defendants, Igor Valeryevich Kolomoisky and Gennadiy Borisovich Bogolyubov (together the "Ultimate Beneficial Owners," or "UBOs"), have been the majority and controlling stockholders of Plaintiff, Joint Stock Company Commercial Bank PrivatBank ("PrivatBank"), since at least 2006, overseeing its growth into one of the largest commercial banks in Ukraine. In 2016, the Ukrainian government uncovered accounting irregularities in PrivatBank's loan book. Because of PrivatBank's systemic importance to Ukraine's financial system, the government nationalized the bank. Litigation ensued in Cyprus, Israel, the United Kingdom and Ukraine concerning the propriety of both PrivatBank's commercial loan book and the government's seizure.

This action concerns claims that Delaware entities controlled by the UBOs acquired hundreds of millions of dollars' worth of United States assets by laundering and misappropriating wrongfully procured commercial loans issued by PrivatBank (the "Optima Scheme"). In this decision, I address the limited question of whether this action should be dismissed or stayed in favor of any or all of the relevant actions pending in various foreign courts.

For reasons explained below, the motion to stay this action in favor of certain actions pending in Ukraine is granted, but with conditions. Specifically, notwithstanding the stay, the Court will continue to address certain procedural issues still in dispute to ensure this action moves as expeditiously as possible should rulings

1

in Ukraine justify a lift of the stay. Those issues include whether process was effectively served, whether this Court has personal jurisdiction over certain Defendants and the preclusive effect of certain Ukrainian judicial decrees or judgments.[1]

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Second Amended Complaint (the "Complaint")[2] and documents properly incorporated by reference or integral to that pleading.[3] Those well-pled facts, unless otherwise stated, are assumed to be true.[4]

---

[1] *See* Def. Gennadiy Bogolyubov's Opening Br. in Supp. of Mot. to Dismiss Pl.'s Verified Am. Compl. (D.I. 133) ("DBOB") at 5–20; Opening Br. in Supp. of Optima Defs.' Mot. to Dismiss Pl.'s Verified Am. Compl. (D.I. 134) ("DOB") at 40; Defs. Korf, Laber, Schochet, Optima 1375 II, LLC, and Optima Int'l of Miami, Inc.'s Opening Br. in Supp. of Mot. to Dismiss Pl.'s Verified Am. Compl. (D.I. 135) ("DKLSOB") at 11–17.

[2] D.I. 146 ("Compl.").

[3] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[4] *See Kofron v. Amoco Chem. Corp.*, 441 A.2d 226, 227 (Del. 1982). I note that the motion before the Court is not brought under Chancery Rule 12(b)(6) and, therefore, the Court could move beyond the pleadings to decide it. *See Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 n.22 (Del. Ch. Oct. 19, 2000) (noting that the court may consider matters beyond the pleadings when deciding whether to stay a proceeding under Chancery Rule 12(b)(3)). For the most part, however, I have chosen not to, mindful that these parties are litigating on multiple fronts and there may be an inclination among the parties to cite my factual recitations here as adjudicated findings of fact(s) before another tribunal. To be clear, I have adjudicated no facts in this Opinion other than facts regarding the pendency and nature of related litigation elsewhere as relevant to the procedural rulings made here.

## A. The Parties

Plaintiff, PrivatBank, is one of the largest commercial banks in Ukraine with headquarters in Dnipro, south-east Ukraine.[5]

Defendants, Kolomoisky and Bogolyubov, founded PrivatBank and were, directly and indirectly, the majority and controlling stockholders of PrivatBank from at least 2006 through December 2016.[6] They are both Ukrainian-born businessmen who are reputed to hold Ukrainian, Israeli and Cypriot citizenships, and both maintain (or have recently maintained) a residence in Switzerland.[7]

Defendant, Mordechai Korf, resides in Miami, Florida and has, over the last decade, worked closely with and at the direction of the UBOs.[8] Korf jointly owns various United States entities with the UBOs. These entities include Defendants Optima Acquisitions, LLC, Optima Ventures, LLC and Optima International of Miami, Inc. ("Optima International").[9] Korf also currently is, or at one time was,

---

Any other "facts" are drawn from allegations in the pleadings and are recounted only for background and context.

[5] Compl. ¶ 7

[6] Compl. ¶ 11.

[7] Compl. ¶¶ 8, 10.

[8] Compl. ¶ 12.

[9] *Id.*

3

the manager, director, organizer and/or president of the Delaware entities that hold (or held) the UBOs' commercial properties in Cleveland, Ohio and Dallas, Texas.[10]

Defendant, Chaim Schochet, resides in Miami, Florida, manages Defendants Optima Ventures LLC and Optima One Cleveland Center LLC, and reports to his brother-in-law Korf and the UBOs[11] It is alleged that Schochet has been the UBOs' front man in the purchase and management of the commercial real estate in Cleveland, Ohio and throughout the United States in furtherance of the Optima Scheme.[12]

Defendant, Uriel Tzvi Laber (together with Kolomoisky, Bogolyubov, Korf and Schochet, the "Individual Defendants"), resides in Miami, Florida and jointly owns various United States entities with the UBOs and/or Korf.[13] Laber currently is, or at one time was, a director, manager, partner, advisor, and/or officer of various entities owned or controlled by the UBOs.[14]

The UBOs ultimately own or control the following Defendants, all of which are Delaware entities: Chemstar Products, LLC, Georgian American Alloys, Inc.,

---

[10] Compl. ¶¶ 13–14.

[11] Compl. ¶ 17.

[12] Compl. ¶ 17.

[13] Compl. ¶ 19.

[14] Compl. ¶ 20.

Optima Acquisitions, LLC, Steel Rolling Holdings, Inc., Optima Group, LLC, Optima Ventures, LLC, Optima 55 Public Square, LLC, Optima One Cleveland Center, LLC, Optima 1375, LLC, Optima 1375 II, LLC, Optima 1300, LLC, Optima 777, LLC, Optima Stemmons, LLC, Optima 7171, LLC, Optima 500, LLC, Optima 925, LLC, Warren Steel Holdings, LLC, Demeter Diversified LLC, Empire Chemical, LLC, and Talbon Alliance, LLC (together, the "Defendant Delaware Entities"). Each of the Defendant Delaware Entities is either under the complete control and direction of the UBOs or is operated by individuals in the United States who are acting as agents for the UBOs.[15]

Defendant, Optima International, is a Florida limited liability company owned by Korf and Laber. Plaintiff alleges, however, upon information and belief, that the UBOs effectively control the entity.[16] Defendant, Felman Trading, Inc., a New Jersey Corporation and wholly owned subsidiary of Georgian American Alloys, is under the day-to-day management of Korf but is ultimately owned and controlled by the UBOs.[17] Defendant, Veroni Alloys LLC, is a limited liability

---

[15] Compl. ¶¶ 23–44.

[16] Compl. ¶ 46.

[17] Compl. ¶ 47.

company organized under the laws of Oregon, and ultimately owned and/or controlled by the UBOs.[18]

## B. PrivatBank is Nationalized

PrivatBank is and has been at all relevant times one of Ukraine's largest banks and of systemic importance to the Ukrainian financial system since at least 2015.[19] The UBOs were the majority and controlling stockholders of PrivatBank from at least 2006 through December 2016.[20]

PrivatBank's principal asset is its commercial loan book.[21] From 2006 to 2016, that asset increased by over 700% (in Ukraine Hryvnia ("UAH") terms) from UAH 27 billion (USD 5.3 billion) in December 2006 to UAH 195 billion (USD 8.1 billion) on December 31, 2015.[22] During the same period, PrivatBank's total liabilities relating to its customer accounts increased eight-fold (in UAH terms) from UAH 24 billion (USD 4.8 billion) to UAH 192 billion (USD 8 billion).[23]

---

[18] Compl. ¶ 48.

[19] Compl. ¶ 56.

[20] Compl. ¶ 2. The UBOs and their associates controlled PrivatBank's Supervisory Board, and thus controlled PrivatBank's significant decisions, including all significant commercial lending decisions. Compl. ¶ 57.

[21] Compl. ¶ 58.

[22] *Id.*

[23] *Id.*

PrivatBank relied predominantly on public debt issuances to fund its loans, attracting new deposits domestically from both retail and commercial customers.[24] To attract deposits, PrivatBank offered high interest rates on its USD and Euro deposit accounts in Ukraine.[25] These deposits allegedly were used to fund hundreds of millions of dollars of illegitimate commercial loans to entities set up by the UBOs and their lieutenants through false and inaccurate loan documentation without adequate collateral.[26] Those entities would subsequently engage in a series of transfers to other shell entities to obfuscate the source of the loans until, eventually, the funds would wind up in the coffers of an entity abroad that would use PrivatBank's funds to acquire assets worldwide, some of which were located in the United States (the "Optima Scheme Loans").[27] Subsequent customer deposits would make their way back to earlier borrowers, who would use those funds to repay the principal and interest of PrivatBank's initial loan, thereby giving the appearance to PrivatBank's auditors that those loans were getting paid off on paper when, in

---

[24] Compl. ¶ 59.

[25] *Id.*

[26] Compl. ¶¶ 61, 65. Plaintiff alleges that, to facilitate and fraudulently conceal the scheme, the UBOs created and used a secretive business unit within PrivatBank's operations (the "Shadow Bank") to fund the fraudulent loans and launder those loan proceeds through a sophisticated money laundering system. Compl. ¶ 3.

[27] Compl. ¶¶ 61–62, 64–87, 205–19.

7

reality, PrivatBank was funding its own loans and increasing its outstanding liabilities in the process.[28]

In October 2016, after an initial period of inspection, the Ukrainian banking regulator, the National Bank of Ukraine (the "NBU"), commenced an inspection of PrivatBank to monitor the bank's capital position.[29] The NBU became concerned that, among other things, many commercial loans appeared to be inadequately collateralized and/or made to entities affiliated with the UBOs.[30] In December 2016, PrivatBank experienced a sharp decline in liquidity and the NBU declared PrivatBank insolvent.[31] To protect PrivatBank's 20 million customers and "preserv[e] the stability of the financial system" in the country, the Ukrainian State started taking the necessary steps to nationalize PrivatBank.[32] This process culminated later in December 2016, when liabilities owed to certain creditors of PrivatBank were bailed-in and the shares in PrivatBank were sold to the Ukrainian State (the Ministry of Finance of Ukraine) for UAH 1.[33] Following nationalization,

---

[28] Compl. ¶¶ 62, 85–87, 205–19.

[29] Compl. ¶ 220.

[30] *Id.*

[31] Compl. ¶ 222.

[32] Compl. ¶¶ 56, 222.

[33] Compl. ¶ 222.

8

PrivatBank's recapitalization was implemented through the contribution of treasury bonds on behalf of the Ukrainian State. Despite the nationalization and recapitalization, the losses suffered by the bank were substantial.[34]

## C. Litigation Ensues and the Anti-Kolomoisky Law is Passed

As might be expected, the state of PrivatBank's loan book and its subsequent nationalization prompted the filing of numerous lawsuits around the world. What follows is a summary of the relevant pending actions, organized (roughly) by geography.[35]

### 1. The Ukrainian Litigation

Various actions have been filed in Ukraine related to the UBOs' alleged fraud and its fallout.

---

[34] Compl. ¶ 223.

[35] Beyond the actions in Ukraine and London detailed here, there are actions pending in Israel, Cyprus and Switzerland that, while related generally to the events leading up to and arising from PrivatBank's nationalization, are not identified by the parties as relevant to the motion *sub judice*. DOB, Ex. B (Translated 12/18/19 Stmt. of Claim) ¶¶ 40, 57, 65, 92 (detailing the Israeli actions against the UBOs); PrivatBank Brings New US$5.5 Billion Claim in Cyprus Against its Former Owners (Apr. 3, 2020), https://en.privatbank.ua/news/2020/4/3/1170 (detailing the Cyprus action); Ukraine's Central Bank Files Swiss Court Claim Against PrivatBank's Former Owner, Reuters (Dec. 19, 2018), https://uk.reuters.com/article/ukraine-privatbank/ukraines-central-bank-files-swiss-court-claim-against-privatbanks-former-owner-idUKL8N1YO270 (detailing the action in Switzerland).

### a. The Nationalization Action and the Anti-Kolomoisky Action

In June 2017, Kolomoisky filed suit in Ukraine seeking an order declaring the nationalization of PrivatBank invalid (the "Nationalization Action").[36] In April 2019, a three-judge panel of the Kyiv District Administrative Court (the "KDAC") ruled that the NBU's nationalization of PrivatBank was "null and void from the time of its execution" and voided the forced sale of Plaintiff's stock.[37] After the NBU appealed that decision, the Sixth Administrative Appellate Court stayed the appeal pending the Ukraine Supreme Court's review of a related case filed by other former shareholders of PrivatBank in which Ukrainian courts also found the nationalization unlawful.[38]

On May 13, 2020, following the KDAC's ruling in the Nationalization Action, the Ukrainian parliament passed Law No. 590-IX, known colloquially as the "Anti-Kolomoisky Statute," which purported to alter remedies available to former shareholders of an illegally nationalized bank.[39] In summary, the Anti-Kolomoisky Statute provides that, if a court determines the government illegally nationalized a

---

[36] DBOB, Ex. 4 ("Marchenko Decl.") ¶ 18.

[37] D.I. 135 (First Decl. of Dmytro Marchukov) ("Marchukov Decl.") ¶ 74; D.I. 235 (Defs.' Supplemental Reply Br. on *Forum Non Conveniens*) ("DSB") Ex. 67 (D.I. 224) (Court Press Release).

[38] *Id.*

[39] DSB Ex. 68 (statute).

bank, the court may not "invalid[ate]" the nationalization or "restore" ownership to the former shareholders; the "only" available remedy in such circumstances is damages.[40] The statute is written to apply retroactively to cases initiated before its enactment.[41]

On June 11, 2020, 64 members of the Ukrainian parliament filed a petition in the Constitutional Court of Ukraine (the "CCU") to challenge the Anti-Kolomoisky Statute as unconstitutional (the "Anti-Kolomoisky Action").[42] These members argue, *inter alia*, that the legislature adopted the statute in violation of constitutional procedures[43] and that its remedial limitations unconstitutionally deprive former bank shareholders of an effective remedy.[44] They also contend that the statute's retroactive application is unconstitutional.[45]

On March 2, 2021, the appellate court stayed further proceedings in the Nationalization Action pending the CCU's ruling in the Anti-Kolomoisky Action.[46]

---

[40] *Id.* at 3.

[41] *Id.* at 24.

[42] DSB Ex. 69 (Petition).

[43] *Id.* at 4–9.

[44] *Id.* at 9–20.

[45] *Id.* at 50–53.

[46] DSB Ex. 70 (news report).

11

On June 2, 2021, in a separate case, the Commercial Court of Kyiv relied on the Anti-Kolomoisky Statute to reject a claim by a former PrivatBank shareholder seeking an order declaring the nationalization of PrivatBank invalid.[47] This ruling, too, is currently on appeal.[48] On June 15, 2021, the Commercial Court of Kyiv suspended proceedings in a case similar to the action filed on June 2, 2021, pending resolution of the constitutional challenge.[49]

On March 27, 2021, the President of Ukraine issued an order purporting to revoke prior decrees appointing two judges to the CCU on national security grounds.[50] Though the CCU still has 14 judges and may conduct proceedings so long as 12 judges sit on the court, the parties dispute whether, and the extent to which, this development will disrupt the CCU's past practice of deciding petitions within six months of filing.[51]

---

[47] D.I. 242 (Decl. of Oleh Beketov) ¶¶ 6–8.

[48] *Id.* at 3 n.1. Defendants' expert on foreign law submitted a supplemental declaration stating that the case is "a non-representative example of the application of the [Anti-Kolomoisky] law." D.I. 243 Ex. A (Fourth Supplemental Decl. and Report of Roman Marchenko) ("Fourth Marchenko Decl.") ¶ 4. Plaintiff's expert disagrees. D.I. 245, Ex. A (Supplemental Decl. of Oleh Beketov) ¶ 17.

[49] Fourth Marchenko Decl. ¶ 16 & n.3.

[50] D.I. 238 (Supplemental Decl. of Oleh Beketov Regarding Developments to the Constitutional Court of Ukraine) ¶¶ 6.

[51] *Compare id.* ¶ 7 (Plaintiff's foreign law expert arguing that the judges' removal may result in a delay of over four years), *with* D.I. 240, Ex. A (Third Supplemental Decl. of

### b. The Defamation Action

In November 2017, Kolomoisky filed a defamation action in Ukraine (the "Defamation Action"). Plaintiff and the NBU are defendants; Bogolyubov is a third-party participant.[52] In the Defamation Action, Kolomoisky alleges the NBU and Plaintiff falsely accused Bogolyubov of engaging in a "fraudulent scheme" to make loans under "fake agreements" to companies he and Bogolyubov controlled.[53]

### c. The Borrower Actions

Since September 2017, PrivatBank and its borrowers have filed numerous lawsuits in Ukraine, including lawsuits over loans that allegedly were used to repay other outstanding loans extended by PrivatBank (the "Borrower Actions").[54] Many of the Borrower Actions involve borrowers seeking declarations that PrivatBank has no right to demand repayment of the original loans because other borrowers repaid them.[55] Indeed, the Borrower Actions involve 56 of the 75 loans identified by

---

Roman Marchenko) ¶¶ 4–14 (Defendants' foreign law expert arguing there will be no resulting delay).

[52] Marchenko Decl. ¶¶ 24–29.

[53] *Id.* ¶¶ 28.4, 28.5.

[54] *See id.* ¶¶ 37, 39–41. The Borrower Actions, Nationalization Action and the Defamation Action shall together be referred to as the "Ukrainian Litigation."

[55] *Id.*

PrivatBank in this case.[56] For example, one borrower featured prominently in the Complaint, Joint Stock company Nikopol Ferroalloy Plant ("Nikopol"),[57] sued PrivatBank in the Economic Court of Kyiv concerning 33 loans, including all 30 Nikopol loans at issue in this action.[58] Nikopol claimed in each suit that PrivatBank's Delaware lawsuit failed to recognize that Nikopol fulfilled all of its obligations under the loan agreements when PrivatBank alleged that Nikopol misused loan proceeds.[59]

---

[56] Compl. at 55, 59, 60, 62–63, 69, 80, 82, 87, 88, 90, 91, 94, 122, 123 (charts of loans); DSB at 2; PSB at 3. Although PrivatBank did not name these borrowers as defendants in this action, it alleges they engaged in misconduct concerning the loans, claiming the borrowers did not use the loans for their stated purposes of financing "current business activities" or "current operations." Compl. ¶¶ 110–11, 114–22, 130–32, 148–49, 152–53, 160–63, 166–67, 174–75. Rather, PrivatBank alleges loan proceeds were transferred to other entities, including entities organized under Delaware law, and were used to purchase assets in other U.S. states. *Id.* PrivatBank further alleges the Ukrainian borrowers never "validly repaid" the loans because they repaid them using funds from "new" loans. Compl. ¶¶ 212–19.

[57] Compl. ¶¶ 68, 110–11 (alleging Nikopol drew down loans for the purported purpose of "financing current business activities of the entity" when, in reality, "the loan proceeds were not used for their stated purposes.").

[58] DSB Exs. 1–33 (Stmts. of Claim).

[59] *Id.* Ex. 1 at 2–3. Nikopol pointed to PrivatBank's allegations in this case that Nikopol misused loan proceeds and failed to repay loans. *Id.* at 3–4, 7–8. In other Borrower Actions, the plaintiff(s) allege that, by suing in Delaware, PrivatBank failed to recognize that the borrowers properly performed their obligations under the loan agreements. *See id.* Ex. 40, at 1–3 (Zaporizhzhia Stmt. Of Claim); *see also* Exs. 40–65 (Stmts. of Claim & Prelim. Orders).

14

After Nikopol's several cases were consolidated into six actions (before different judges), and Nikopol submitted evidence, including "detailed accounting source documents regarding the exact purpose for which the loan proceeds were used" and "bank statements and other official documents" confirming repayment,[60] the courts held hearings and issued rulings against PrivatBank in all six actions rejecting its allegations that Nikopol misused loan proceeds and failed properly to repay loans.[61] Applying Ukrainian law, each judge held that, by suing in Delaware, PrivatBank failed to "recognize [Nikopol's] proper fulfillment of [the] loan agreements,"[62] holding that Nikopol used loan proceeds "for the purpose provided for in the [relevant] loan agreements, which is the financing of [its] current activities."[63] While several judges noted the loan agreements "did not define the source of funds from which [Nikopol] would repay the loan[s],"[64] the judges

---

[60] *See* DSB Ex. 34, at 7, 9 (Baranov).

[61] *Id.* Ex. A; *id.* Ex. 34 (Baranov); *id.* Ex. 35 (Marchenko); *id.* Ex. 36 (Gulevets); *id.* Ex. 37 (Usatenko); *id.* Ex. 38 (Spychak); *id.* Ex. 39 (Nechai).

[62] DSB Ex. 35 at 17 (Marchenko); *accord id.* Ex. 34 at 10 (Baranov); *id.* Ex. 36 at 14 (Gulevets); *id.* Ex. 37 at 23 (Usatenko); *id.* Ex. 38 at 16 (Spychak); *id.* Ex. 39 at 17 (Nechai).

[63] DSB Ex. 35 at 19 (Marchenko); *accord id.* Ex. 34 at 12 (Baranov); *id.* Ex. 36 at 17 (Gulevets); *id.* Ex. 37 at 22 (Usatenko); *id.* Ex. 38 at 23 (Spychak); *id.* Ex. 39 at 9 (Nechai). As noted above, this directly contradicts the allegations in the Complaint. Compl. ¶¶ 110–11.

[64] DSB Ex. 36, at 9 (Gulevets); *accord id.* Ex. 34, at 6-7 (Baranov); *id.* Ex. 37, at 14 (Usatenko); *id.* Ex. 38, at 11 (Spychak); *id.* Ex. 39, at 8 (Nechai).

nonetheless found that Nikopol repaid certain loans "at the expense of funds received by [Nikopol] from business activities, at the expense of the Guarantor and not at the expense of other loan proceeds, which were received by [Nikopol] under other loan agreements,"[65] while other loans were repaid using "funds obtained from business activities and at the expense of the Guarantor, as well as at the expense of other loan funds obtained by [Nikopol] under other loan agreements."[66]

On April 14, 2021, the Court of Appeals upheld the Kyiv Economic Court's decision and dismissed PrivatBank's appeal.[67] Relevant here, the Court of Appeals upheld the Economic Court's factual findings that, contrary to PrivatBank's allegations in this Delaware case, Nikopol (a) properly used the loan proceeds to finance its current business activities, (b) fully repaid the loan and (c) properly repaid the loan with funds received from the company's economic activities or the guarantor.[68]

---

[65] DSB Ex. 34, at 12-13 (Baranov); *accord id.* Ex. 35, at 19 (Marchenko); *id.* Ex. 36, at 10 (Gulevets); *id.* Ex. 38, at 14 (Spychak); *id.* Ex. 39, at 9 (Nechai).

[66] DSB Ex. 35, at 19 (Marchenko); *accord id.* Ex. 36, at 10 (Gulevets); *id.* Ex. 37, at 14 (Usatenko).

[67] D.I. 241, Ex. A.

[68] *See id.* at 9–11, 15.

## 2. The London Litigation

In December 2017, Plaintiff commenced an action in the High Court of Justice in London against Kolomoisky, Bogolyubov and six companies incorporated in the United Kingdom or the British Virgin Islands purportedly under the UBOs' ownership or control (the "London Litigation").[69] The London Litigation involves claims brought by Plaintiff under Ukrainian law for, *inter alia*, unjust enrichment arising from loans issued to 46 Ukrainian companies as part of the same allegedly fraudulent scheme at issue in this action.[70]

In 2018, the London court dismissed all claims against Kolomoisky and Bogolyubov for lack of personal jurisdiction, and held that, in any event, the case should be stayed pending resolution of the Defamation Action.[71] In 2019, the appellate court reversed and remanded, holding in part that a stay in favor of the Defamation Action was not warranted because the court of first instance in Ukraine stated that the cause of action was frivolous.[72] The London Litigation is ongoing.

---

[69] Marchukov Decl. ¶ 82.

[70] *Id.* ¶¶ 84–86.

[71] *Id.* ¶ 88.

[72] PAB, Ex. H ¶ 208.

## D. Procedural History

On May 21, 2019, PrivatBank filed its initial complaint in this Court.[73] On July 14, 2020, PrivatBank filed the amended operative Complaint, asserting eight counts including unjust enrichment, fraudulent transfer, violations of Ohio's RICO statute, conspiracy to violate Ohio's RICO statute and civil conspiracy.[74] PrivatBank seeks damages from all Defendants (including on a veil-piercing theory), costs, an accounting of Defendants' assets, and a constructive trust over assets located throughout the United States, among other relief.[75]

On July 28, 2020, Defendants filed their motions to dismiss the Complaint on various grounds, including *forum non conveniens*.[76] On November 13, 2020—the parties' deadline for agreeing upon a proposed schedule for briefing the motions to dismiss—Defendants filed a Motion to Bifurcate Briefing on Motions to Dismiss and Stay Jurisdictional Discovery.[77] The Court granted Defendants' bifurcation motion six days later, on November 19, 2020, and directed PrivatBank to answer the

---

[73] D.I. 1.

[74] Compl. ¶¶ 226–305.

[75] *Id.* The Complaint is detailed, spanning 305 paragraphs and roughly 150 pages. *See generally* Compl.

[76] *See generally* DOB.

[77] D.I. 164.

18

*forum non conveniens* portion of Defendants' motions to dismiss or stay on or before December 16, 2020.[78] The Court heard argument on the motion on January 22, 2021.[79] The parties subsequently filed supplemental submissions regarding developments that post-dated Defendants' reply brief.[80] Since then, the parties have submitted multiple letters updating the Court on various Ukrainian decisions relevant to this motion, along with further expert affidavits regarding how those developments should impact the Court's determination regarding whether to stay or dismiss this action.[81]

## II. ANALYSIS

Defendants seek to dismiss or stay this action in favor of the Ukrainian Litigation, the London Litigation or both.[82] In the event the Court decides to stay the action, the parties submitted competing *status quo* orders. For reasons explained below, a partial stay of this action is justified as a matter of efficient case management and as a matter of convenience for the affected parties.

---

[78] D.I. 167.

[79] D.I. 195. Defendants replied on January 6, 2021. D.I. 184 (Defs.' Reply Br. in Supp. of their Mots. to Dismiss for *Forum Non Conveniens*) ("DRB").

[80] D.I. 231 (Pl.'s Supplemental Submission in Opp'n to Defs.' Mots. to Dismiss for *Forum Non Conveniens*) ("PSB"); D.I. 235 (DSB).

[81] D.I. 235–41.

[82] DOB at 31.

## A. A Stay Is Justified as a Matter of Efficient Case Management

"Under *McWane*, this Court may, in the exercise of its discretion, stay an action 'when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues.'"[83] Where, however, another action is not first-filed, "[t]he plaintiff's choice of forum is accorded [] more weight."[84] In that situation, the court will consider the motion "under the traditional *forum non conveniens* framework set out in *Cryo-Maid*, without regard to a *McWane*-type preference of one action over the other."[85] While *McWane* and *Cryo-Maid* lay out the factors to be considered when a court is confronted with an application to dismiss or stay an action on *forum non conveniens* grounds, as explained below, these are not the only bases upon which a stay of litigation may be justified.

---

[83] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 116 (Del. Ch. 2009) (quoting *McWane v. McDowell-Wellman Eng. Co.*, 263 A.2d 281, 283 (Del. 1970)).

[84] *Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Ref., L.P.*, 777 A.2d 774, 778 (Del. 2001).

[85] *In re The Bear Stearns Cos. S'holder Litig.*, 2008 WL 95992, at *5 (Del. Ch. Apr. 9, 2008) (quoting *Rapoport v. The Litig. Tr. of MDIP Inc.*, 2005 WL 3277911, at *2 (Del. Ch. Nov. 23, 2005) (citing *General Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 781 (Del. 1964))); *see also Mar-Land*, 777 A.2d at 778 ("A plaintiff seeking to litigate in Delaware is afforded the presumption that its choice of forum is proper and a defendant who attempts to obtain dismissal based on grounds of *forum non conveniens* bears a heavy burden.").

There is no dispute that the Nationalization Action, the Defamation Action, and the London Litigation were first-filed.[86]  For its part, the London Litigation is irrelevant to the forum analysis as it concerns a separate endpoint for separate loans—wrongdoing distinct from the Optima Scheme at issue here.[87]  As for the other flagged actions, none involve the Defendant Delaware Entities or any of the Individual Defendants except the UBOs (i.e., Korf, Laber and Schochet).  Indeed, Defendants admitted at oral argument that PrivatBank could not litigate the Optima Scheme anywhere else, underscoring how the issues in this Court differ from those being litigated abroad.[88]  Such circumstances, in my view, militate strongly against an outright dismissal of Plaintiff's claims here.[89]  These claims will have to be litigated at some point; the question is when they should be litigated in relation to the other pending actions.

---

[86] *See* PAB at 16; DOB at 31–32.

[87] Though Defendants argue this case should be dismissed or stayed in favor of the London Litigation, the loans and the named Defendants here (except the UBOs and PrivatBank) differ from those in the London Litigation.  *See* Decl. of Oleh Beketov in Response to Defs.' Mot. to Dismiss (D.I. 179) ("Beketov Decl.") ¶ 32.

[88] D.I. 210 (Oral Arg. on Defs.' Mots to Dismiss for *Forum Non Conveniens*) 75:24–80:12.

[89] *See Aranda v. Philip Morris USA*, 183 A.3d 1245, 1251–52 (Del. 2004) (explaining that the availability of another forum should be considered as a factor (albeit not a dispositive one) under *Cryo-Maid*).

Plaintiff's theory of the case is predicated on proving that the Optima Scheme Loans were illegitimately sourced in Ukraine; in other words, there is no way to excise the question of whether these loans were proper from this Delaware action without gutting Plaintiff's claims. The Ukrainian Litigation is proceeding apace on all fronts, and those cases implicate many of the underlying issues of foreign law that are front and center in this case. The Nationalization Action will determine whether the Ukrainian government lacks standing to bring an action through PrivatBank in the first instance (here or elsewhere) because its nationalization of the bank was unlawful and the UBOs should have remained in control of PrivatBank (as Defendants argue on brief).[90] As part of that inquiry, Ukrainian courts are set to decide the propriety of PrivatBank's loan practices and the constitutionality of the Anti-Kolomoisky Statute as matters of Ukrainian law.[91] Were this Court to move forward with this case now, it would be forced to adjudicate these issues of Ukrainian law at the same time those issues are being litigated before judges expert in that

---

[90] DBOB at 24 ("PrivatBank lacks standing to sue because a Ukrainian court has declared its nationalization void.").

[91] DRB Ex. 2 ("Marchenko Reply Decl.") ¶ 9. PrivatBank does not appear to contest Marchenko's assertion that the Nationalization Action will address whether the bank's loans were "inadequately secured" and therefore unlawful under Ukrainian law. That issue bears directly on whether the UBOs caused the bank to issue "illegitimate, inadequately-secured loans." Compl. ¶ 3. Moreover, if the Ukrainian appellate courts ultimately invalidate the nationalization, the Ukrainian State will lack standing to sue on PrivatBank's behalf. DKLSOB at 5–6; DBOB at 24.

law.[92]  The risk of inconsistent judgments is high.[93]  Our Supreme Court has recognized that, in such circumstances, "our courts must acknowledge that important and novel issues of other sovereigns are best determined by their courts where practicable."[94]

---

[92] DBOB at 24 ("PrivatBank lacks standing to sue because a Ukrainian court has declared its nationalization void.").

[93] In this sense, this case presents a hybrid factual scenario where a stay in Delaware to allow adjudication of related issues by a foreign court may be warranted as a matter of case sequencing and efficient management.  *See Davis Ins. Gp., Inc. v. Ins. Assocs., Inc.*, 1998 WL 892623, at *2 (Del. Ch. Dec. 3, 1998) ("It is possible a case will not fit neatly into either [*McWane* or *Cryo-Maid*] because it shares attributes of both.  When faced with such a case, the Court must determine whether the case's attributes of a first-filed action with the same parties and issues outweighs the case's attributes supporting a denial of a stay on the basis of a *forum non conveniens* analysis."); *Martinez v. E.I. DuPont de Nemours and Co., Inc.*, 86 A.3d 1102, 1113 (Del. 2014) (reasoning that, just as plaintiffs have a "substantial interest in having important open questions of Delaware law decided by [Delaware] courts," defendants have a "reciprocal" interest in "having important issues of foreign law decided by the courts whose law governs the case.").

[94] *Id.* at 1110.  Plaintiff has submitted expert testimony that the CCU is "in crisis" because the president of Ukraine issued an order, on national security grounds, that purports to revoke prior decrees appointing two judges to Ukraine's Constitutional Court, increasing the odds that a decision on the constitutionality of the Anti-Kolomoisky Statute would "remain[] undecided for 4 years or longer."  D.I. 238 (Supplemental Decl. of Oleh Beketov Regarding Developments to the Constitutional Court of Ukraine) ¶¶ 5–7.  According to Defendants' expert, however, this situation is not unprecedented, the CCU still has 14 judges and may conduct proceedings so long as it consists of at least 12, judges can be replaced quickly, the CCU has a practice of deciding petitions within six months, and a high-profile case is typically resolved in a shorter timeframe.  D.I. 240, Ex. A (Third Supplemental Decl. of Roman Marchenko) ¶¶ 4–14.  Common sense would counsel that Ukrainian courts will move quickly to adjudicate the fate of what Plaintiff alleges to be a national bank of systemic import in Ukraine.  Compl. ¶ 56.  In any event, the stay ordered here is a partial stay that will permit briefing on certain predicate matters to proceed and will allow the Court to reassess the stay upon adjudication of those threshold issues if it is evident the relevant Ukrainian actions are not moving with sufficient speed.

The Borrower Actions similarly concern important issues of foreign law and bear directly on the substance of PrivatBank's allegations.[95]  It would be useful to allow Ukrainian courts to sort through those issues of Ukrainian law before the Court confronts those issues here.  Whether first-filed or not, "[t]his sort of coordination in case management more readily falls within the Court's broad discretion in controlling its docket effectively and is not necessarily driven by . . . the *forum non conveniens* analytical context."[96]

---

[95] Compl. ¶¶ 110–11, 114–22, 130–32, 148–49, 152–53, 160–63, 166–67, 174–75 (alleging the borrowers did not use the loans for their stated purposes of financing "current business activities" or "current operations," but instead transferred those loans to Defendant entities to purchase assets in the United States); Compl. ¶¶ 212–19 (alleging the Ukrainian borrowers never "validly repaid" the loans because they repaid them using funds from "new" loans).  To be sure, the propriety of the majority of the Optima Scheme Loans are directly at issue in the Borrower Actions.  In those cases, the courts will address PrivatBank's allegations in this case that the Optima Scheme Loans were inappropriately sourced; the foreign law experts dispute whether the Borrower Actions could give rise to issue or claim preclusion; and Ukrainian courts are expeditiously adjudicating those disputes (and have, in certain instances, held in favor of the borrowers).  *See* D.I. 239 (Defendants updating Court via letter that, on April 14, 2021, the Ukrainian appellate court upheld the trial court's January 1, 2021, ruling on certain Nikopol loans at issue in this litigation); D.I. 241 (Defendants updating the Court via letter regarding an April 14 opinion entering judgment against PrivatBank concerning a Nikopol loan); PSB at 8 (emphasizing that the Borrower Actions would not have preclusive effect on the Delaware action); DSB at 9 n.4 (arguing the opposite).  Though later-filed, the propriety of loans issued by PrivatBank at the direction of the UBOs are inarguably of great import to Ukraine, again implicating our Supreme Court's admonition that trial courts "must give [ ] weight to a defendant's interest in having important issues of foreign law decided by the courts whose law governs the case."  *Martinez*, 86 A.3d at 1110.

[96] *IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*, 2016 WL 297655, at *3 (Del. Ch. Jan. 16, 2016); *see also Ins. Co. of N. Am. v, Steigler*, 300 A.2d 16 (Del. Super. Ct. 1972) (holding that the "court has the inherent power to stay proceedings in control of its docket"); *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, (Del. Ch. 2009) ("This Court possesses the inherent power to manage its own docket

24

## B. Traditional *Forum Non Conveniens* Factors Justify a Stay

In the best case for Plaintiff, the Court would give no deference to the first-filed foreign actions, would ignore its inherent power to stay for the sake of efficient case management, and would decide the matter, instead, strictly under *Cryo-Maid*. Even under that plaintiff-friendly analysis, however, the result is the same.

"When a Delaware court is confronted with the question of whether to stay an action in favor of another action, it considers the [*Cryo-Maid*] factors":[97]

> (1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction; (5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive.[98]

Each of these factors, as relevant, counsel in favor of staying this case.

### 1. Relative Ease of Access to Proof

The discovery and development of relevant facts will be easier in Ukraine because that is where the allegedly unlawful loans at issue here originated. Though

---

including the power to stay litigation on the basis of comity, efficiency, or simple common sense.").

[97] *IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*, 2016 WL 297655, at *3.

[98] *Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1198–99 (Del. 1997) (citing *Cryo-Maid*, 198 A.2d 618).

PrivatBank asserts that "much of the relevant documentary evidence . . . is located in the U.S.," or is in the "Delaware Defendants' possession," the Complaint affirmatively pleads that certain Ukrainian defendants directed Ukrainian borrowers fraudulently to apply for loans from a Ukrainian bank and moved those Ukrainian proceeds through accounts in Ukraine and Cyprus.[99] While the actions of the Delaware entities are part of that story, they constitute the ultimate (or perhaps penultimate) chapter; as the Complaint makes clear, the story begins in Ukraine, and that is where much of the proof will reside.[100]

Making matters more difficult, Ukraine's reservation to Article 23 of the Hague Evidence Convention means that Ukraine "will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in

---

[99] Compl. ¶¶ 2–3, 64–68. PrivatBank asserts that Ukrainian procedures for discovery are sufficient to facilitate fact-gathering in this action—a position in some conflict with its position in its motion for alternative service where it argued that Ukrainian procedures were "not working and may be delayed indefinitely." D.I. 172 (Pl.'s Mot. for Alternative Method of Service) ¶ 14.

[100] *See VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *8 (Del. Ch. Apr. 28, 2014) ("*VTB I*") (finding this factor weighed in favor of defendant where the "vast majority" of evidence "would not be in Delaware but rather in Ukraine"). I note the alleged asset acquisitions occurred in states outside Delaware, such as Ohio, Texas, West Virginia and Kentucky, and the *forum non conveniens* analysis typically focuses on evidence in the forum state. Compl. ¶¶ 4–5; *Schmidt v. Washington Newspaper Publ'g Co.*, 2019 WL 4785560, at *7 (Del. Super. Ct. Sept. 30, 2019) (finding this factor favored defendant where the "overwhelming majority of evidence . . . [is] in California and none is located in Delaware"); *Abrahamsen v. ConocoPhillips Co.*, 2014 WL 2884870, at *2 (Del. Super Ct. May 30, 2014) (same).

common law countries."[101] According to Defendants' expert, pre-trial discovery of documents in Ukraine will not occur "unless the request is sufficiently substantiated and contains information sufficient to specifically identify the requested documents."[102] That reservation undeniably complicates access to proof, militating in favor of a stay pending the progress of the Borrower Actions and Nationalization Action, where discovery of evidence in Ukraine will be more efficient and effective.[103]

## 2. Availability of Witnesses

While Plaintiff is likely correct that significant evidence concerning the Optima Scheme Loans resides in the United States, Plaintiff's own Complaint includes allegations detailing the involvement of "other conspirators," "senior-level managers and other PrivatBank employees," "Cypriot law firms," and Cypriot

---

[101] Marchukov Decl. ¶¶ 42, 62; Marchenko Decl. ¶ 95.2; *VTB I*, 2014 1691250, at *8 (explaining that Ukraine "has 'filed a reservation' regarding its authority to reject pre-trial discovery requests" requiring that "oral examination of witnesses take place before a Ukrainian judicial officer and then be summarized by court personnel"); *see also Abrahamsen*, 2014 WL 2884870, at *3 ("Norway may not comply with . . . requests because Norway has adopted reservations to . . . Article 23 . . ."); *Margulis v. Stryker Corp.*, 2019 WL 6830209, at *6 (D.N.J. Nov. 12, 2019), *adopted*, 2019 WL 6828175 (D.N.J. Dec. 12, 2019) (finding Argentina's Article 23 reservation "strongly" favored defendant in its bid to dismiss the complaint on forum grounds). Though Plaintiff argues *VTB I* is of limited utility because the court there relied on an "unrebutted affidavit," it does not challenge that Ukraine has, in fact, submitted a reservation to Article 23. *See* PAB at 31.

[102] Marchenko Decl. ¶ 95.2.

[103] *See VTB I*, 2014 WL 1691250, at *8 (finding Ukrainian reservation favored dismissal).

"officers and directors" of intermediary companies.[104] "Common sense would indicate that [foreign] witnesses would not be available to testify in Delaware."[105] And Plaintiffs' own allegations undermine their contention that Defendants control some of the key witnesses, having pled such employees were "dismissed" from the bank upon nationalization, suggesting that no party controls them.[106] These witnesses are outside the Court's subpoena power and Defendants have no means of compelling their appearance in Delaware.[107] This burden would be meaningfully

[104] Compl. ¶¶ 62, 64, 71–72. Though PrivatBank argues Defendants have not identified such witnesses with sufficient specificity, Delaware courts have held in similar circumstances that identifying the "*kinds* of important, third-party witnesses [who] are likely not subject to the Court's compulsory powers," as Defendants have done here, is sufficient. *VTB I*, 2014 WL 1691250, at *9 (emphasis added); *but see Lee ex rel. Lee v. Choice Hotels Int'l Inc.*, 2006 WL 1418755, at *5 (Del. Super. Ct. Mar. 21, 2006) ("Delaware law requires that [Defendant] identify specifically the witnesses not subject to compulsory process and the specific substance of their testimony."). In any event, as noted, Plaintiff itself has identified specific witnesses that it alleges were integral to the purported misconduct alleged in its Complaint who reside beyond the Court's subpoena power. Compl. ¶¶ 62, 64, 71–72.

[105] *Ward v. Tishman Hotel & Realty, L.P.*, 2010 WL 5313549, at *3 (Del. Super. Ct. Nov. 30, 2010) ("It is not necessary to prove that witnesses without a stake in a particular litigation would not voluntarily travel to a foreign jurisdiction to provide testimony in order to demonstrate an overwhelming hardship.").

[106] Compl. ¶ 65.

[107] *See VTB I*, 2014 WL 1691250, at *9 (finding court lacked compulsory process over Ukrainian witnesses). Though Plaintiff contends that Ukraine "provides mechanisms for foreign parties to compel discovery" from third parties, its expert does not refute that such mechanisms are dependent upon witness cooperation, do not assure examination by defense counsel, and are potentially time-consuming. *See* DRB Ex. 1 ("Marchukov Reply Decl.") ¶¶ 44–53; Marchenko Reply Decl. ¶¶ 37–38.

28

reduced if this action was stayed pending discovery in, and resolution of, the Nationalization Action and Borrower Actions.

### 3. Possibility of the View of the Premises

Neither party has argued that this factor is relevant here.

### 4. Governing Law

While I need not definitively decide the issue, it would appear that Ukrainian law will apply to many if not all of PrivatBank's claims. "Delaware resolves choice of law questions for both tort and contract using the 'most significant relationship' test from the Restatement (Second) of Conflicts [the "Restatement"]."[108] Those factors are laid out in Restatement Section 145: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[109] These factors likely support the application of Ukrainian law.[110]

---

[108] *IM2 Merch. & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at *10 n.49 (Del. Ch. Nov. 2, 2000)

[109] *VTB I*, 2014 WL 1691250, at *9 n.90 (applying Ukrainian law to claims for unjust enrichment and fraudulent transfer).

[110] I note that Plaintiff did not dispute that Ukrainian law applied in the London Litigation, which involves similar allegations of a scheme concerning separate loans originating in Ukraine. DOB Margules Decl., Ex. A ¶ 21 (Judgment).

*First*, "a corporation sustains its injuries where it is incorporated and where it has its principal place of business,"[111] and Plaintiff is a company headquartered in, and incorporated under the laws of, Ukraine.[112]

*Second*, the allegedly injurious conduct, at its source, was the improper issuing of the Optima Scheme Loans, which also took place in Ukraine.[113] Though Delaware entities ultimately took possession of the allegedly ill-begotten loans, their coffers were among the last links in an alleged chain of events that were, according

*Remainder of Page Intentionally Left Blank*

---

[111] *TrustCo Bank v. Mathews*, 2015 WL 2953373, at *10 (Del. Ch. Jan. 22, 2015).

[112] Compl. ¶ 7.

[113] Compl. ¶¶ 2–3, 62–66; *see Aranda*, 183 A.3d at 1253 (holding claims arising from herbicides used on Argentinian farms constituted "conduct occurring in Argentina" despite defendants' intent that the fruit of the crops be consumed in America); *Integral Res. (PVT) Ltd. v. Istil Gp., Inc.*, 155 F. App'x 69, 70, 75 (3d Cir. 2005) (holding conspiracy claim governed by Ukrainian law because the alleged "plotting, conspiracy and machinations" occurred in Ukraine). Plaintiff's citation to *City of Almaty v. Sater* is unavailing, as the court there was deciding between application of English or New York law to a Kazakhstan-based bank's laundering scheme where the essence of the wrongdoing was the disregard of a court order. 2020 WL 7027566, at *1–4, *8 (S.D.N.Y. Nov. 30, 2020) (holding New York law applied over English law because the defendants' conspiracy to evade the English court's freezing order occurred in New York, not England).

30

to the Complaint, unlawful at their inception.[114]   Based on the Complaint's

allegations, then, this factor favors the application of Ukrainian law.[115]

*Third*, Plaintiff and the UBOs are all linked to Ukraine without any

meaningful connection to Delaware, while Korf, Schochet and Laber are all from

states outside Delaware.  The only Delaware contact flows through the entities'

---

[114] *GTE Mobilnet Inc. v. Nehalem Cellular, Inc.*, 1994 WL 116194, at \*3 (Del. Ch. Mar. 17, 1994) (applying Oregon law notwithstanding "all parties" being "incorporated in Delaware"); *Johnson v. Warner Bros. Entm't, Inc.*, 2017 WL 588714, at \*4 (D. Del. Feb. 14, 2017) (rejecting argument that Delaware law applies because "a majority of Defendants are incorporated in Delaware").  Though Plaintiff quotes *Callaway Golf Co. v. Dunlop Slazenger Gp. Ams., Inc.* for the proposition that, "[w]here the claim to restitution [for unjust enrichment] does not stem from any [direct] relationship between the parties, the factor . . . of greatest importance [in the choice-of-law analysis] is the place where the benefit of enrichment was received," in this case, there is clearly a "direct relationship" between the UBOs and PrivatBank.  29 F. Supp. 2d 430, 434–35 (D. Del. 2003).

[115] *See VTB I*, 2014 WL 1691250, at \*9–10 (finding this factor favored application of Ukrainian law in the context of a money-laundering scheme implicating United States entities); *Aranda*, 183 A.3d at 1253 (applying Argentinian law under similar circumstances).  Plaintiff relies heavily on *City of Almaty v. Sater* to argue that this factor favors application of Delaware law.  2020 WL 7027566 (S.D.N.Y. Nov. 30, 2020).  Again, that case is inapposite, as it addressed a Kazakhstan-based bank citing English law to sue New York defendants for conspiring to "launder money" stolen from the plaintiff-bank and subject to an English court's freezing order.  *Id.* at \*1–4, \*8.  Unlike this case, the bank's founder was not named as a defendant and the plaintiff did not seek redress for the founder's earlier misappropriation. *Compare Almaty*, 2020 WL 7027566, at \*1, \*4 (bank's founder not a defendant) *with* Compl. ¶ 1 (naming the UBOs as Defendants).  Accordingly, there was no predicate question of whether misappropriating loan proceeds in a foreign country was lawful; instead, the issue was whether New York (where defendants were domiciled and the conduct occurred) or English law (where the freezing order issued) applied to plaintiff's claim for conspiracy to avoid the freezing order— conduct distinct from the underlying, earlier Kazakhstan-based scheme. *Almaty*, 2020 WL 7027566, at \*8.

31

incorporation in Delaware and, as our courts have held, that contact is not dispositive in the choice of law or choice of forum analyses.[116]

*Fourth*, the principal relationship in the Complaint is the one between PrivatBank and the UBOs, and that relationship is centered in Ukraine.[117] As for the Ohio RICO claims, those claims would likely turn on underlying questions of Ukrainian (not Delaware) law.[118] While the application of foreign law may not be dispositive of these claims, the Court may nonetheless weigh "a defendant's interest in having important issues of foreign law decided by the courts whose law governs the case."[119]

---

[116] *See VTB I*, 2014 WL 1691250, at *9–10; *see also IM2 Merch.*, 2000 WL 1664168, at *9–10 (applying Canadian law where defendant's "only connection to Delaware" was place of incorporation).

[117] Compl. ¶¶ 2–4.

[118] For example, the predicate offense of Ohio money-laundering would require proof that the loan proceeds were the product of "unlawful activity," a determination that reverts to Ukrainian law. Ohio Rev. Code Ann. ("RCA") §§ 1315.51(O), 1315.55(A)(2); Compl. ¶ 258. Likewise, Plaintiff's claim of federal money laundering requires proof of "an offense against a foreign nation"—in this case, Ukraine. 18 U.S.C. §1956(a)(7)(B); Compl. ¶ 258. Though Defendants raised this argument on brief, Plaintiff did not meaningfully respond. *Compare* DOB at 26 & n.14 (making the foregoing arguments) *with* PAB at 35–40 (failing to dispute Defendants' assertions as to the operation of the statutes governing Ohio and federal money-laundering).

[119] *Martinez*, 86 A.3d at 1110 (citing *IM2 Merchandising*, 2000 WL 1664168, at *10 ("A due respect for the presumed capability of the courts of other nations and states to fairly adjudicate cases, however, counsels that this consideration be accorded some worth, even when no prior action is pending in their courts.")).

As a final fallback, Plaintiff is left to argue the choice-of-law analysis is moot because there is no difference between Ukrainian and Delaware law on the subjects at issue. Specifically, after briefing its position on the conflict-of-law analysis (which, I note, addressed only one of the four choice-of-law factors),[120] PrivatBank asserted that the analysis is unnecessary because "Ukrainian law provides for corresponding causes of action as those asserted in the [Complaint] for unjust enrichment, fraudulent transfer, and civil conspiracy."[121] Though PrivatBank cites to its expert's affidavit as support for the mootness argument, that assertion is contradicted not only by Defendants' experts but also a past decision of this court finding that "[t]he Civil Code of Ukraine contains no direct counterpart to Delaware's unjust enrichment and fraudulent transfer laws."[122] In any event, uncertainty about Ukrainian law (as evidenced by disagreement among experts) signals that Ukrainian courts should decide these predicate matters in the first instance.[123]

---

[120] PAB at 35–36.

[121] *Id.* at 39 (citing Beketov Decl. ¶¶ 12, 33–44).

[122] *VTB Bank v. Navitron Projects Corp.*, 2015 WL 9581538, at *6 (Del. Ch. Dec. 29, 2015) ("*VTB II*"); DRB at 18 (citing Marchukov Reply Decl. ¶¶ 11–13, 15–33; Marchenko Reply Decl. ¶¶ 20–36).

[123] *VTB II*, 2015 WL 9581538, at *6.

## 5. The Pendency of Similar Actions

For reasons explained, the Nationalization Action and the Borrower Actions will address issues of foreign law that also must be addressed in this action. More specifically, the Borrower Actions will adjudicate the propriety of roughly 75% of the loans at issue here, several of which have already been addressed at both the trial court and appellate levels in Ukraine.[124] In the Nationalization Action, the matters decided by the Ukrainian courts will have a direct bearing on whether Plaintiff has standing to sue Defendants. While neither action involves the exact claims prosecuted here, such that a dismissal of this action might be justified, both actions will yield decisions on foreign law that will inform the resolution of this action. This dynamic favors a stay of this action in favor of the Nationalization Action and the Borrower Actions.

## 6. "All Other Practical Problems"

Finally, numerous practical considerations favor staying this action pending resolution of the Borrower Action and the Nationalization Action. First, there will be significant costs associated with translating Ukrainian evidence and law. Given

---

[124] DSB at 2 (characterizing the number of Optima Scheme Loans under adjudication in the Borrower Action); PSB at 3 (agreeing with that characterization).

the breadth of this case, the time and resources necessary for that undertaking will be significant, as the relevant documents are sure to encompass voluminous loan applications, internal Ukrainian bank records concerning the approval of those loans, communications among Ukrainian members of the "Shadow Bank" that allegedly facilitated Defendants' money laundering scheme, communications between bank employees, and wire transfer and other bank information written in Ukrainian and Greek (the primary language of Cyprus). Key witnesses to the alleged events will likely speak Ukrainian natively and, to a lesser extent, Greek. This process will "be cumbersome, inefficient, and extremely difficult,"[125] but that burden may not be necessary depending on rulings in Ukraine.[126]

According to PrivatBank, this factor actually favors denial of the motion on several grounds. First, it argues this Court ought to have an interest in adjudicating this dispute promptly because Delaware entities allegedly have been used as

---

[125] *VTB I*, 2014 WL 1691250, at \*8 (holding this factor supported dismissal where documentary evidence is "most likely written in Ukrainian" as translation of all relevant evidence "would be cumbersome, inefficient, and extremely difficult"); *see also Hupan v. Alliance One Int'l, Inc.*, 2015 WL 7776659, at \*5 (Del. Super. Ct. Nov. 30, 2015) (holding this factor supported dismissal where key evidence was "in another language, which will require translation").

[126] *VTB II*, 2015 WL 9581538, at \*6; *Martinez*, 86 A.3d at 1110.

instruments to facilitate an unlawful scheme.[127]  While I agree that a Delaware entity

engaging in (or used to facilitate) fraud or other wrongdoing should expect that it

can be held to account in Delaware courts,[128] a partial stay will preserve

PrivatBank's claims against these Delaware entities while allowing the Ukrainian

courts to decide predicate issues of Ukrainian law.  PrivatBank's concern that

deference to the Ukrainian courts will result in undue delay in Delaware is belied by

the docket in this action; that docket reflects the Court has received nearly monthly

updates from both parties on the steady progress of both the Nationalization Action

and the Borrower Actions.[129]  Though it is difficult to predict whether these actions

---

[127] PAB at 41 (citing *Certain Underwriters at Lloyds Severally Subscribing Policy No. DP359504 v. Tyson Foods, Inc.*, 2008 WL 660485, at \*5 (Del. Super. Ct. Mar. 7, 2008)).

[128] *See NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 26 (Del. Ch. 2009); *see also Hamilton P'rs, L.P. v. England*, 11 A.3d 1180, 1213 (Del. Ch. 2010) (explaining Delaware's interest in policing the use of Delaware entities as vehicles for fraud "militates powerfully in favor of retaining jurisdiction"); *VTB I*, 2014 WL 1691250, at \*11 ("Employing a Delaware entity in fraudulent conduct can be considered an abuse of the laws of Delaware that is hard for this Court to ignore.").

[129] *See, e.g.*, D.I. 239 (Defendants updating Court via letter that, on April 14, 2021, the Ukrainian appellate court upheld the trial court's January 1, 2021 ruling on certain Nikopol loans at issue in this litigation); D.I. 241 (Defendants updating Court via letter with an opinion from Ukraine regarding the April 14 judgment against PrivatBank concerning a Nikopol loan); D.I. 242 (Plaintiff updating the Court on a ruling applying the Anti-Kolomoisky Law to limit former stockholders of PrivatBank to money damages); D.I. 243 (Defendants submitting a declaration detailing other lower court decisions on the Anti-Kolomoisky Law); D.I. 244 (Defendants updating the Court on a recently issued decision by a Ukrainian appellate court rejecting PrivatBank's appeal on a judgment concerning a Nikopol loan); D.I. 245 (letter dated August 13, 2021 providing updated declaration from

36

will continue to progress apace, a temporary stay to be revisited following this Court's adjudication of certain threshold procedural issues will properly account for the risk that the Ukrainian Litigation stalls.

Finally, PrivatBank lists as a practical consideration the Ukrainian courts' inability to impose a "constructive trust" over United States assets.[130] The parties agree, however, that this Court has authority to enter a properly tailored *status quo* order requiring judicial approval before specific United States assets owned by the Defendant Delaware Entities over which PrivatBank seeks a constructive trust may be sold or encumbered.[131] Provided that the order is effectively tailored, PrivatBank's concern should be neutralized. To that end, the parties have submitted competing *status quo* orders.[132] Upon review, Defendants' proposal would unduly limit the scope of the *status quo* order to encumbered assets with massive debt and little equity value.[133] For example, Defendants represented to the Court that they expected the sale of 55 Public Square to net "millions of dollars in net proceeds"

---

Plaintiff's foreign law expert and a copy of a recent decision of the Commercial Court of Kyiv).

[130] PAB at 43 (citing Beketov Decl. ¶ 38); Marchenko Reply Decl. ¶ 26 (accepting Beketov's assertion that a constructive trust is unavailable).

[131] DSB at 13; PSB at 12–13.

[132] D.I. 235 (Defs.' Proposed *Status Quo* Order); D.I. 231 (Pl.'s Proposed *Status Quo* Order).

[133] D.I. 235 (Defs.' Proposed *Status Quo* Order).

when, in reality, it netted only $660,449.[134] Plaintiff's more comprehensive *status quo* order is warranted to provide Plaintiff proper security for the more than $600 million in damages it seeks in this action.

Further, to ensure this action proceeds as expeditiously as possible should the determination of predicate Ukrainian law issues reveal that the stay should be lifted, the Court will allow for further litigation to proceed regarding the following preliminary procedural issues as raised by the parties (the "Identified Issues"): (1) the implications of Plaintiff's alleged failure properly to serve Kolomoisky and Bogolyubov; (2) this Court's personal jurisdiction over Laber, Korf, Schochet, Optima International and Bogolyubov; and (3) as raised by PrivatBank in its supplemental brief, whether the Borrower Actions will have a preclusive effect on this action as a matter of Delaware law.[135] The parties shall confer and submit a proposed schedule to present these issues to the Court. Depending on the outcome of some or all of these issues, and the pace at which the Ukrainian Litigation proceeds in the interim, the Court may revisit its decision to stay these proceedings.

---

[134] PSB Ex. 9.

[135] DOB at 31–40; DBOB at 5–22; DKLSOB at 11–18; PSB at 9.

### III.    CONCLUSION

Defendants' motion to dismiss under the doctrine of *forum non conveniens* is DENIED; the motion to stay this action pending adjudication of the Borrower Actions and the Nationalization Action is GRANTED.  Plaintiff's application for the entry of a *status quo* order is GRANTED.  The parties shall submit a proposed form of Order for further proceedings relating to the Identified Issues within ten (10) days.

**IT IS SO ORDERED.**